## Matter of Precision Tube Co., Inc.

*Michael Sklaroff* and *Peter R. Pinney,* for appellant.

*Maxine T. Woelfling,* for Department of Environmental Resources.

*John M. Hrubovcak* and *Gregory S. Ghen,* for Department of Transportation.

WATERS, *Chairman,* August 29, 1975—This matter comes before the board as an appeal from the grant by the Department of Environmental Resources (hereinafter "DER") of two permits to the Pennsylvania Department of Transportation (hereinafter "PennDOT") to construct necessary culverts for stream crossings for the planned North Penn Expressway. The new State highway will cross the Wissahickon Creek near the property of Precision Tube Co., Inc., the intervenor herein, and because of the problems they expect this to create, including a drastic reduction in their water supply as well as for alleged statutory and constitutional violations, they oppose DER's action.

## FINDINGS OF FACT

1. Appellant, Precision Tube Co. (hereinafter

"Precision") is a corporation conducting a business along the Wissahickon Creek in Upper Gwynedd Township, Montgomery County, near where the stream crossing of the proposed North Penn Expressway will be constructed.

2. Intervenor is the permittee PennDOT, which received two permits issued under The Water Obstruction Act from the predecessor of DER in 1971.

3. The permits were issued for portions of the construction of Legislative Route 782, commonly known as the North Penn Expressway (hereinafter "expressway") a proposed four-lane limited access State highway, entirely State-funded, which is planned to go from Spring House to Kulpsville, Montgomery County, at a total cost of not less than $40,000,000 in 1974 dollars; the current status of funding is that no funds are yet budgeted for construction, but funds are available for right-of-way acquisition.

4. PennDOT made application to DER in 1970 for the permits here in controversy, and the exhibits C-6, P.D. 9, and A-2 must be taken collectively, due to microfilming problems of DER, to establish the contents of PennDOT's application for these permits.

5. P.D. 9 includes the documents forwarded to DER for the 1970 application. This exhibit differs from appellant's exhibit 2 which it alleges to be the application because of the missing stream profile and channel cross-section sheet.

6. Stream profiles and cross-sections were forwarded from PennDOT to DER as part of the application.

7. These stream profiles and cross-sections were missing from DER's files for this permit application

and the Fish Commission reports in DER and PennDOT's files differ.

8. DET had its records microfilmed and, upon receiving the microfilm, found sheets missing and found instances where the entire permit and documentation is missing. The stream profiles and cross-sections were probably lost during microfilming.

9. The area surrounding and in which the project is located is characterized by existing roads, railroad facilities, power lines, and residential and light industrial development such that it would be extremely difficult to establish a *greenbelt* system.

10. The work in the project area covered in this litigation begins at the downstream side of the Reading Railroad structure. Going downstream, there will be a relocated rock-lined channel for the Wissahickon Creek for about 260 feet; then there will be a highway culvert 413 feet long; then the relocated rock-lined channel for the Wissahickon Creek will continue for about 394 feet; then a second highway culvert, 82 feet long, will be constructed; then the relocated rock-lined channel will continue for 436 feet.

11. In a meeting on June 4, 1973, PennDOT was requested by DER to perform a secondary project study and in this study was advised to ignore the Reading Railroad culvert in order to analyze the full impact of the PennDOT culvert disregarding the restriction caused by the Reading Railroad culvert because the railroad structure may not exist in the future and PennDOT was also advised not to consider effects downstream of the culverts.

12. The study completed for PennDOT by Sandors and Thomas, Engineers, in 1974 was forwarded by DER to the Wissahickon Valley

Watershed Association which commented on the report.

13. The project also includes pipes which carry storm water, as opposed to sewer water, runoff from the highway slopes shoulders and paving. If these pipes were not constructed, rainwater could pond on the highway or it could find its way to the stream another way.

14. The requirements of FWWR-23 which contain instructions for the permit application, were not absolute regulations nor were they enforced as such; they were only guidelines of the Department of Forests and Waters, predecessor to DER.

15. The plans for highway ramps were modified by PennDOT so that Precision could, and did, expand their plant.

16. PennDOT also will construct a retaining wall along the main line of the highway to further reduce the amount of right-of-way that would be needed from Precision.

17. In 1973, a report prepared by Valley Forge Laboratories for Precision was presented to PennDOT as a proposal to reroute the expressway in the vicinity of Wissahickon Avenue.

18. This plan, not adopted, involved shifting the main line off of the property of Precision onto adjacent property, keeping Wissahickon Avenue open, and rearranging the ramp configuration.

19. PennDOT exhibit 4 is a narrative description of the Erosion Control Plan which includes a discussion of the erodibility of the soil types in the area, the controls that will be implemented, and the sequence of operations that the contractor will follow during construction.

20. The purpose of the Erosion Control Plan is to stop the earth under the topsoil from eroding when

it is exposed and to prevent the sediment from washing off the highway construction site, although no separate permit was issued for this plan.

21. A basic premise is that no more than 17 acres of land area within a watershed will be disturbed at any one time. The project is segmented and construction will take place on a defined sequence of operation. The project is divided into 15 distinct areas of work ranging from 2 to 17 acres.

22. The erosion control plan includes velocity dissipators to prevent erosion at culvert outlets, lined channels to prevent erosion in the channels, basins to take out the silt, seeding to keep erosion from occurring, and hay bales to filter out sediment during construction.

23. If grading doesn't proceed according to plan and an area remains exposed more than 21 days, temporary seeding is to be performed.

24. If construction proceeds in the winter, the plans in the Erosion Control Plan require sedimentation basins, straw bales, and other methods used in conjunction with seeding.

25. As a permanent feature, trees will be planted and these plantings are included on the construction drawings.

26. A velocity dissipator is to be constructed at any major outfall of a pipe carrying runoff from the highway to the stream. There is a rock sedimentation basin. It is a formed basin and fully lined with rocks. It will serve to lower or dissipate the velocity of the runoff water coming from the culverts and help to settle out any sediment during construction.

27. This rock-lined channel will not only protect the channel but should also aid in ground water recharge.

28. The Standard Drawings and Specifications

Form 408 and Standard Drawings RC 70 indicate the specifications for the rocks in the rock channels.

29. The decision was made by DER on or about January 10, 1975, to accept the 1974 Hydraulic Report as a supplement to the permit application.

30. The Pennsylvania Department of Transportation, then the Department of Highways, PennDOT, was granted encroachment permits DH14153 and DH14159 by DER, then the Water and Power Resources Board of the Department of Forests and Waters, on January 5, 1971.

31. Permit DH14153 authorized two culverts and channel changes in the Wissahickon Creek at Station 701 and 108+, Route 782-7 in Upper Gwynedd Township, Montgomery County.

32. Permit DH14159 authorized a bridge over the Wissahickon Creek at Station 60 + 75, Route 782-7 in Gwynedd Township, Montgomery County.

33. The culverts permitted by DH14153 would extend for lengths of 60 feet and 400 feet, respectively, in the channel of the Wissahickon Creek. Each of the culverts would be a box-type reinforced concrete structure with an opening of 16 feet by 10 feet.

34. PennDOT's structure plans now specify culvert lengths of 82 feet and 413 feet, respectively.

35. DER has neither received nor approved modifications to the culvert lengths as specified in the original permit application.

36. DER submitted the 1974 Sanders and Thomas report and the Watershed Association objections to Milton Johnson, Chief of the Division of Water Control Structures of DER, for analysis.

37. PennDOT's application for water obstruction permits was not accompanied by complete

maps, plans, profiles, and specifications of the water obstruction which PennDOT now plans to construct.

38. The permits which are the subject of this appeal have, in fact, been amended by PennDOT and the acceptance by DER of a 1974 report evidences concurrence in said amendment.

39. The permits make no provision for a unilateral alteration of the plan, profiles and data and the proposed construction, from that set forth in the application upon which the permits were based.

40. According to the Chief of the Division of Dams and Encroachments of DER, Mr. Butler, no time limits were placed on PennDOT permits because of the length of time it takes PennDOT to go into design and because of its own independent procedural requirements.

41. The permits do not authorize the construction of culverts 413 feet and 83 feet long, respectively. The permits do not authorize artificial channels of a length greater than 400 and, accordingly, do not allow construction of channels of approximately 1,100 feet in addition to the culverts.

42. Appellant herein, Precision, received written notice of the permits on November 20, 1974, when its counsel obtained photostatic copies of the permits from DER.

43. Appellant filed its appeal and petition within 30 days thereafter.

44. The reach of the Wissahickon, which is the subject of this action, at Wissahickon Avenue in Upper Gwynedd Township, is approximately 12 feet wide at that point; there, the Wissahickon runs through gently rolling landscape in an area of single-family residential, apartment and light industrial uses. The watershed at that point is approximately 2.6 square miles.

45. The Wissahickon is in the Piedmont region of the Commonwealth. In the area of this reach of the Wissahickon, the geology consists largely of Brunswick shale, which is a very dense material with a very low primary porosity, while the soils are heavy type soils with low permeability.

46. The Wissahickon Watershed at the reach in question is urbanized and is likely to become more so, especially as a result of the construction of the North Penn Expressway and the interchange.

47. The obstructions were designed initially in 1971 for a 50-year flood frequency; a preferred flood frequency today for design purposes is 100 years.

48. The plans for the construction of the highway interchange over the Wissahickon provides for the piping of the untreated highway runoff into the Wissahickon through many pipes spouting directly into the stream; the pipes or point sources range in size from 12 to 48 inches in diameter.

49. As a result of the expressway project, appellant may lose a unique well which has been pump tested officially at 210 gallons per minute for 72 hours and reportedly yields over 500 gallons a minute.

50. Because of the poor water yield characteristics of the Brunswick formation and the fact that appellant's well most likely draws water from a fracture system, the likelihood of drilling a new well of the magnitude of this well is not good. Appellant uses approximately 20,000 gallons of water from its wells per day. After it is used, this water is treated and recycled into the Wissahickon.

51. The assumptions of the quantity of flow during a 50-year storm of 1930 c.f.s. and for a 100-year storm of 1600 c.f.s. form the basis of the 1974 hydraulic investigation submitted to DER by PennDOT. These assumptions and the figures in-

dicated in the 1974 hydraulic investigation are very serious under-estimates of the actual flood magnitudes of Wissahickon Creek at the point under consideration according to appellant's calculations made by Dr. Hammer using another method which gave special empahsis to soil type.

52. In analyzing the hydrology and assumptions contained in the 1974 hydraulic investigation, Dr. Hammer applied to the problem a method he developed in his research with the Regional Science Research Institute, the methodology developed by the United States Department of Agriculture Soil Conservation Service and a modified method which he based upon the soil conservation service methodology, making adjustments for rainfall distribution.

53. PennDOT has obtained no permits from DER or the United States Environmental Protection Agency permitting the discharge of storm water into the Wissahickon through these pipes.

54. The Sanders and Thomas erosion and sedimentation control plan prepared for PennDOT for the entire project, including the Wissahickon Creek crossing, was reviewed by the Montgomery County Soil Conservation Service and was approved in March of 1974.

55. In the opinions of Messrs. Butler and Johnson, DER experts, the culverts are hydraulically adequate and formed a reasonable basis for the granting of the permits.

56. The Division of Dams and Encroachments requested the Division of Water Quality of the Bureau of Water Quality Management of DER to undertake an environmental assessment.

57. The Division of Water Quality did not perform the assessment because of priorities in its work load.

58. DER through the Division of Dams and Encroachments has taken no further action with respect to the environmental assessment.

59. Exhibit P.D. 1 contains a public notice for the expressway and includes the area where this project is located and requests citizen input for the expressway itself and any part of the expressway.

60. Also, exhibit P.D. 6 shows that the Department of Health, the Department of Mines and Mineral Industries, the Department of Forest and Waters, the Topographic and Geological Survey Unit, as well as DER were contacted for their comments and input to the project.

61. Mr. Johnson of DER, a qualified expert in the field of hydraulics performed a hydraulic analysis of the project area which included the Reading Railroad culvert. DER received profiles and cross-sections of the Wissahickon Creek for 4,000 feet upstream and 500 feet downstream. This was sufficient data to corroborate the study.

62. This study by DER was independent of the 1974 report and showed that even if the Reading Railroad culvert is included in the analysis, the highway culverts will have no detrimental effect. The highway culvert has no effect upstream of the railroad culvert.

63. The relocation of the channel and the backfilling of the existing channel with the same type of soil materials as currently exists should not adversely alter or affect the groundwater recharge of this area.

64. Municipal water supply is available to appellant as well as the possibility of drilling another well.

65. There is no evidence of fish life nor significant fauna in the permitted area.

## DISCUSSION

This case has raised many new, important and difficult issues. The many propositions and arguments brought forth in lengthy testimony and voluminous briefs can be reduced to three categories for purposes of discussion and, hopefully, resolution. They are jurisdictional, statutory and constitutional objections.

At the outset, of course, the question of jurisdiction was raised numerous times, by oral motion, motion for compulsory nonsuit at the close of testimony and, finally, as a major argument urged upon us by intervenor, in post-hearing briefs. Appellant argues that this appeal was filed timely. The basic jurisdiction of the Environmental Hearing Board arises from the Administrative Code, §1924 A, Act of April 9, 1929, P.L. 177, as amended, 71 P.S. §510-21(a), which provides:

"(a) The Environmental Hearing Board shall have the power and its duties shall be to hold hearings and issue adjudications . . . on any order, permit, license or decision of the Department of Environmental Resources."

In 1970, PennDOT applied for two permits which were subsequently issued to it in 1971 by DER's predecessor, for the construction of certain culverts and channels, which required a permit under the Pennsylvania Water Obstructions Act for a crossing of the Wissahickon Creek by the projected North Penn Expressway. In 1972 or thereafter, PennDOT decided to change the culverts and channel and submitted new and additional information to DER. At no time, however, did PennDOT ask for, or receive, amended permits showing the changes which they proposed. Appellant was faced

with the impossible task of determining exactly when DER "decided" to permit the changes in question, so that an appeal could be filed from that decision within the required 30 days. We have hereinafter determined that an amendment to the permits as issued was and is required. Unless appellant is allowed to raise such question in the manner employed in this case, it could *never* do so at the proper time. If DER simply acquieses in the unilateral amendment action of PennDOT, how can a property owner who would be adversely affected by this decision (not to require an amended permit) mandated by statute, *ever* file a timely appeal? Although it is this problem which most troubles us, it is the regulations of the board which finally must decide the question. When this appeal was filed on December 19, 1974, 25 Pa. Code §21.21(a) provided:

"(a) In cases where Appeals are authorized . . . such Appeal shall be in writing and shall be filed with the board thirty (30) days from the date of receipt of written notice of an action of the Department . . ."

The evidence in this case convinces us that appellant through its counsel did not receive written notice of the issuance of the permits in question until November 20, 1974. This appeal was filed within 30 days, and was therefore timely.[1] See Robert L. Anthony, Action for Community Survival, et al. v. Commonwealth of Pennsylvania, De-

---

1. The rules previously provided for a 15-day appeal period but this was changed and the 30-day provision became effective December 15, 1973. It would be turning back the clock in more ways than one, to now apply the 15-day rule and dismiss this appeal as untimely.

partment of Environmental Resources, Appellee, Springfield Associates, Intervenor, EHB Docket No. 73-356-W (issued November 19, 1973).[2]

PennDOT next argues that it is not subject to the jurisdiction of the board because the permits which it requested were not really required, inasmuch as it is a State agency and not a "person" under the Pennsylvania Water Obstructions Act.[3]

The Governor's first and foremost obligation is to assure that all agencies under his jurisdiction comply with constitutional provisions. Among such constitutional provisions is article I, sec. 27, which provides that the people of the Commonwealth "have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment." Executive Order 1973-9 issued on July 13, 1973, but not published, is designed to assure compliance with the dictates of article I, sec. 27, through delineating the duties of the agencies of the Commonwealth to act as trustees of the public natural resources. And, secondly, the Governor, in promulgating this Executive Order, is fulfilling his duty to "take care that the laws of the Commonwealth be faithfully executed; . . ."

The question then becomes one of the status conferred on PennDOT by the Executive Order. PennDOT has correctly asserted that it and other

---

2. In Robert L. Anthony, supra, appellant was able to establish the belated date of written notice receipt and his appeal was allowed as timely filed.

3. The Pennsylvania Water Obstructions Act of June 25, 1913, P.L. 555 sec. 7, 32 P.S. §687, provides:

"Any person or persons, partnership, association or corporation, county, city, borough, town or township, . . ."

State agencies are not within the definition of "person" in section 2 of the Pennsylvania Water Obstructions Act, supra: but, as a result of the Executive Order, PennDOT is legally obligated to comply with the standards and permit provisions of the Pennsylvania Water Obstructions Act in the same manner as any person therein defined. In pertinent part, the Executive Order states:

"Therefore, by virtue of the authority vested in me as Governor of the Commonwealth and in furtherance of the purposes and policies of . . . the Water Obstructions Act (Act of June 25, 1913, P.L. 555 as amended), I hereby direct the following steps be taken:

"1. The heads of all administrative departments, independent administrative boards and commissions and other state agencies under my jurisdiction shall ensure that state government facilities and activities comply with the above listed environmental laws and the regulations promulgated thereunder."

The requirement that PennDOT comply with the Pennsylvania Water Obstructions Act, supra, includes the requirement that it comply with the permit application and approval provisions of that law like any private person. PennDOT must obtain "the consent or permit" of DER:

". . . to construct any dam or other water obstruction; or to make or construct, or permit to be made or constructed, any change therein or addition thereto; or to make, or permit to be made, any change in or addition to any existing water obstruction; or in any manner to change or diminish the course, current, or cross section of any stream or body of water, wholly or partly within, or forming a

part of the boundary of, this Commonwealth, except the tidal waters of the Delaware River and of its navigable tributaries": 32 P.S. §682.

The Executive Order, itself, sustains the interpretation that PennDOT or any other Commonwealth agency must be treated like a person for purposes of complying with the enumerated statutes. This conclusion is reinforced by the stated purposes of the Executive Order:

"In implementing environmental control programs, the Commonwealth is making demands on individuals and industry to stop practices which pollute. Government too must do its share to clean up our environment."

It is clear from this passage that the intent of the Governor was to require State agencies to comply with environmental protection laws, including permit provisions thereof, like any individual or corporation within the Commonwealth.

In complying with the Pennsylvania Water Obstructions Act, supra, and the rules and regulations promulgated thereunder, PennDOT is not merely seeking the advice or gratuitous approval of DER, but is legally subject to the approval actions of DER.

The appellant's statutory objections, which we must next discuss, are many in number. First, appellant argues that The Clean Streams Law,[4] and the regulations promulgated thereunder require PennDOT to have a soil erosion control permit—which was not required by DER.

---

4. The Clean Streams Law of June 22, 1937, P.L. 1987, as amended, 35 P.S. §§691.1, et seq.

The Regulations provide four exceptions to the erosion and sedimentation permit requirements, as follows, 25 Pa. Code 102.31(a):

"Any person who engages in an earthmoving activity within the Commonwealth shall obtain a permit prior to commencement of the activity except a permit will not be required:

"(1) where the earthmoving activity involves plowing or tilling for agricultural purposes;

"(2) where an erosion and sedimentation control plan has been developed for an earthmoving activity by the U.S.D.A. Soil Conservation Service;

"(3) where an activity is required to obtain a permit pursuant to the Clean Streams Law (35 P.S. §691.1 et seq.), the Surface Mining and Reclamation Act (52 P.S. §1396.1 et seq.), the Water Obstruction Act (32 P.S. §681 et seq.) or the provisions of Chapter 91-101 of this Title (relating to water pollution);

"(4) where an earthmoving activity affects less than 25 acres."

PennDOT believes that it fits within section 4 inasmuch as the project will be carried out in sections of 17 acres at a time. We do not agree. This would not be compliance with, but could be a device to avoid, compliance with the law. We do find, however, that the erosion control plan was developed with and approved by the Soil Conservation Service and, therefore, falls under the provisions of section 102.31(a)(2). It would take a strict legalistic approach to the act and the regulations to hold that the use of the words "developed by" the S.C.S., do not extend to erosion plans which are "developed with and approved by" it. We are explicitly ad-

monished by Payne v. Kassab,[5] not to take that approach.[6]

The erosion control plan includes velocity dissipators to prevent erosion at culvert outlets, lined channels to prevent erosion in the channels, basins to take out the silt, seeding to keep erosion from occurring, hay bales to filter out sediment during construction. The plans include temporary as well as permanent features which will remain after the project is completed. The erosion control plan is incorporated into the construction contract, both in the plans as well as the contract proposal. In addition to the erosion control plan, unforeseen water pollution problems are considered by placing an item in the construction contract whereby the contractor could draw money from a special fund to take care of this possible problem. This convinces us that the plan is adequate and the procedure used reasonable.

Appellants next argue that permits for the outfall structures are required by The Clean Streams Law, supra.[7] The project, in the area of concern in this litigation, does include pipes which carry storm

---

5. Payne v. Kassab, 11 Pa. Commonwealth Ct. 14, 312 A. 2d 86 (1973).

6. See The Chesterbrook Conservancy v. Commonwealth of Pennsylvania, Department of Environmental Resources and The Fox Company, Intervenor, EHB Docket No. 73-418-W (issued October 18, 1974), in which we upheld this procedure as not being an improper delegation of authority to S.C.S.

7. Appellant makes substantially the same argument under the provisions of the Federal Water Pollution Control Act 33 U.S.C. A. §1251-1376, which requires an NPDES permit for pollution discharges into certain waterways. Although not developed at hearings, it appears that the actual enforcement responsibilities of DER under the act are not yet fixed and of course would not be reviewable at this time by the board.

water runoff, as opposed to industrial and sewer water, from the highway slope shoulders and paving. If these pipes were not constructed, rainwater could pond on the highway creating a safety hazard to the motoring public or rainwater could find its way to the stream by another way.

The Clean Streams Law, supra, deals with sewage and industrial wastes and not with storm water. Storm water is different from sewage and industrial wastes in that it comes from a natural phenomenon. Rainfall is not now and never has been considered a pollutant. Rainfall may, during its travel from the time it falls to its eventual depository merge with other substances, but this is only natural. This rainfall will eventually find itself in a stream of the Commonwealth.

The Clean Streams Law is codified in 35 P.S. §691.1, et seq. Section 35 P.S. §691.3 states that:

"The discharge of *sewage* or *industrial waste* or any *substance* . . . which causes or contributes to *pollution* as herein defined or creates a danger of such pollution is hereby declared not to be a reasonable or natural use of such waters." (emphasis supplied).

We agree with DER and the Intervenor that rainwater runoff does not presently fall within any of the enumerated criteria.[8]

Appellant has argued a violation by PennDOT of the Act of April 9, 1929, P.L. 177, as amended, 71 P.S. §512(a)15, which places certain consultation requirements upon it. We find that PennDOT, did,

---

8. Although some of the "substances" which accumulate along the roadway like salt and hydrocarbons could arguably fall within the provisions of the act, we do not find it an abuse of discretion on the part of DER in not so viewing storm water.

in accordance with the code consult the other departments of government as required. Although appellant is apparently not satisfied with the method or results of that consultation, we do not believe the statute goes quite so far as to require that. We are of the same view regarding the public hearings advertised by PennDOT in August and September, 1970.[9]

Finally, appellant alleges violation of the Pennsylvania Water Obstructions Act, supra, which creates a framework whereby DER is charged with a continuing responsibility to safeguard the public interest by monitoring all construction and modification of water obstructions within the Commonwealth. Section 2 of the Pennsylvania Water Obstructions Act as amended contains the operative proscription: Pennsylvania Water Obstructions Act, Act of June 25, 1913, P.L. 555, as amended, 32 P.S. §682, provides:

"it shall be unlawful for any person or persons . . . to construct any dam or other water obstruction; or to make or construct, or permit to be made or constructed, any change therein or addition thereto; . . . or in any manner to change or diminish the course, current, or cross section of any stream, or body of water . . . without the consent or permit of the Water and Power Resources Board [Department of Environmental Resources], in writing, previously obtained upon written application to said board [Department] therefor."

---

9. Appellant has not demonstrated that the project area is a "recreational area" within the meaning of 71 P.S. §512(a)15, requiring special conditions before it can be used for highway purposes.

The undisputed testimony of PennDOT in this proceeding is that PennDOT presently proposes to encroach upon the Wissahickon Creek in the following manner, to wit: beginning from the downstream end of the PennDOT construction, PennDOT proposes the following changes in the stream: for a length of 436 feet the stream will flow in an artificial channel; at the upstream end of this artificial channel, PennDOT proposes to construct an 82-foot concrete box culvert, 16 feet wide and 10 feet high; from the upstream end of this box culvert PennDOT proposes to construct another artificial channel 394 feet in length; at the upstream end of the second artificial channel, PennDOT proposes to construct a third artificial channel for a length of an additional 260 feet. The total length of artificial channel is, therefore, 1,585 feet. Furthermore, the record is undisputed that these modifications of the stream will result in current changes, i.e., changes in the velocity of flow of the stream. Also, these obstructions and channel modifications necessarily result in changes in the course and cross-section of the Wissahickon Creek throughout the entire length of the stream modification area. Each such water obstruction, course change, current change, and change in cross section of the Wissahickon Creek is prohibited unless a DER permit has been previously issued authorizing such changes: 32 P.S. §§682 and 687, supra.

The permits which are the subject of this appeal are the permits on which PennDOT relies to authorize the above-described water obstructions and changes in course, current and cross sections of the Wissahickon Creek. The permits, however, do not authorize the planned obstructions or the planned

changes in the course, current, and cross section of the Wissahickon Creek.

The permit identifed as File No. DH 14153 gives the consent of the Water and Power Resources Board, now DER, to the construction of culverts with a clear span of 16.75 feet, on a 73 degree skew and a clearance above the stream bed of 10 feet across, and to change the channel of the Wissahickon Creek at station 701+ and 108+ route 782, section 7, ramp D in Upper Gwynedd Township, Montgomery County. Furthermore, the permits contain the following textual limitation:

"This permit, issued with the understanding that the work herein approved shall be *performed in accordance with the plans, profiles and data sheet filed with the application*, does not give any property rights, either in real estate or material, nor does it authorize any injury to private property or invasion of private rights." (emphasis supplied).

The second permit, identified by File No. DH 14159 gives the consent of the Water and Power Resources Board to the construction of a bridge with four different clear spans on an 87 degree, 30 feet skew and a clearance above the stream bed of 23 feet across, and to change the channel of the Wissahickon Creek at station 60+ 75, ramp G, route 787-7, in Upper Gwynedd Township, Montgomery County. This permit also contains the textual identical limitation which is quoted above.

Since both permits specify approval only for work performed in accordance with plans, profiles and data sheets filed with the application, the application must be examined to determine the nature and extent of permitted obstructions and other stream

modifications. The description of the structures for which permits were sought is contained at page 5 of the narrative section of the application as follows (beginning from the downstream end of the obstructions and modifications and moving upstream):

"The present proposal for a 60 feet long culvert under ramp 'D', about 400 feet long channel with a bridge carrying ramp 'G' and about 400 feet long culvert under L.R. 782 was studied (see layout scheme 'D') and found most economical with equal construction feasibility."

The undisputed testimony of PennDOT verifies that the above quotation constitutes an accurate description of the structures and encroachments for which permits were sought.

As provided specifically in the Pennsylvania Water Obstructions Act, supra, and inherent in the nature of a permit-granting agency's responsibility, the proper procedure for a permit applicant when design changes are introduced in its proposed water obstructions is to describe those design changes and submit them to DER for its approval. Any change in a proposed project which adds additional artificial channel is a material change and one to be avoided unless absolutely necessary. PennDOT's presently proposed water obstructions, because they require 1,585 feet of artificial channel, constitute a substantial additional environmental incursion beyond the 860 linear feet permitted by the permits. Other planned changes in the location and length of the box culverts and the configuration of the channel may indeed have material environmental or hydraulic effects; and it is our

view that this judgment is to be made in the first instance by DER in its action on a request for permit amendment. Until such a request is made and acted upon, no work is permitted except that specifically authorized by the extant permits.

In the case of Commonwealth of Pennsylvania Water & Power Resources Board v. Green Spring Company, 349 Pa. 1 (1958), the court sustained an equity action by the Commonwealth under the act against a fish hatchery which increased the height of an encroachment of a nonnavigable stream on its property only 17 inches. Clearly, then, the changes here are not de minimis or permitted by some theory of latitude not present in the language of the permits.[10]

The major question throughout this proceeding was whether DER abused its discretion or acted arbitrarily in relying upon culvert size figures for flood purposes calculated by the use of one accepted hydrological method rather than another. The extended battle of the experts which consumed most of the time in this lengthy hearing need not be resolved by a finding that the witnesses for one party are more worthy of belief than those of another. After hearing all of the very technical testimony offered on the question of the hydrological soundness of the culverts we find no real credibility issue,[11] only a gaping difference of expert opinion on methodology. Although we can find no abuse of

10. It should also be noted that any person who makes or causes to be made a current change not authorized by a permit is guilty of a misdemeanor: 32 P.S. §687.

11. We found all of the technical witnesses to be knowledgeable, candid and truthful in expressing their differing opinions. The differences were to some degree due to the fact that different hydraulic calculation methods were used by each party. We need not decide that DER or PennDOT used the best

discretion on the part of DER in accepting its own and PennDOT's calculations, reports and figures upon which it relied at the hearing stage in this case, we can nevertheless, not overlook what is a clear violation of statute when DER allows PennDOT to unilaterally amend water obstruction permits.

One of the few things on which all parties have agreed is that the three-pronged test handed down in Payne v. Kassab, supra, is applicable to this case. When a Commonwealth action affecting the environment is under review, Article I, sec. 27, of the Pennsylvania Constitution requires that the reviewing court or board test the decision by this standard: (1) Was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources? (2) does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum? (3) does the environmental harm which will result from the challenged decision or action so clearly outweigh any benefits to be derived therefrom that to proceed further would be an abuse of discretion?

We have reviewed our findings in light of the first Payne test and in so doing we must answer "No" to that question. This is alone sufficient reason for us to remand this case to DER for further action with regard to the permit amendments. Consequently, we need not now speculate on matters as they might exist if there were no violation of statute.[12]

---

method, only that a reasonable or acceptable method was relied upon by DER.

12. Appellant has raised a number of issues which relate to the alleged failure of DER to conduct what is referred to as an environmental review or assessment of matters related to the

Appellant has based many of its objections in this appeal upon the matters controlled by the decision of this board in Mrs. Cyril G. Fox and Natural Lands Trust, Inc., Appellants; Central Delaware County Authority, Permittee; Community College of Delaware County, Intervenor v. Commonwealth of Pennsylvania, Department of Environmental Resources, EHB Docket No. 73-078-B[13] (issued May 16, 1974). Subsequent to the filing of briefs in this matter that decision of the board was reversed by the Commonwealth Court. The court, speaking through Judge Blatt said:

"It must be remembered, however, that the power of an administrative agency must be sculptured precisely so that its operational figure strictly resembles its legislative model.

". . . it *is not a proper function of the DER to second-guess the propriety of decisions properly made by individual local agencies in the areas of planning*, zoning, and such other concerns of local agencies, even though they obviously may be related to the plans approved. Moreover, *impropriety related to matters determined by those agencies is the proper subject for an appeal from or a* direct challenge to the actions of those agencies

---

permit grant. In this category are such things as the salt and hydrocarbon content highway runoff. We believe these matters if relevant at all in a proceeding of this kind, must be dealt with only in line with the third test laid down in Payne v. Kassab, supra. Having decided that the first test was not met by DER, we have not examined the record in detail with reference to the second and third tests.

13. We there held an environmental review of secondary impacts of any action should be considered by DER before issuing a permit.

[here PennDOT] as the law provides, not *for an indirect challenge through the DER. . . .*"[14]

The case goes on to hold that DER is not the only agency involved in the enforcement of article I, sec. 27, of the Pennsylvania Constitution, and that secondary impacts and alternate uses of resources were not proper subjects of inquiry for DER or this board to make.

Finally, there should be some comment on Precision's well, which we believe has been the major impetus to this proceeding. We can, of course, add nothing to the Eminent Domain Law, but we are convinced that PennDOT has a proper concern for the tremendous economic benefit appellant stands to lose if this well cannot be saved. Inasmuch as "just compensation" is the heart of our Eminent Domain Law, and the potential loss, inasmuch as public water is available, does appear to be purely economic, we feel that our action does not leave appellant high and dry,[15] but with an adequate remedy.

---

14. See Community College of Delaware County and Community College of Delaware County Authority, Appellants, and Township of Marple, Intervening Appellant v. Mrs. Cyril G. Fox and Natural Lands Trust, Inc., Appellee, 654 C.D. 1974 (July 18, 1975) and Central Delaware County Authority, Appellant v. Mrs. Cyril G. Fox and Natural Lands Trust, Inc., Appellees, 743 C. D. 1974 (July 18, 1975), which further states:

"We would agree with the EHB that 'some comprehensive planning is required of the trustee,' but we simply cannot sustain the notion that section 27 automatically designates and authorizes the DER either to act as sole trustee and do all such planning or to supervise and/or coordinate the planning responsibilities of local government agencies. Desirable as such supervision and/or coordination may be, neither section 27 nor any pertinent legislation authorizes the DER to provide it."

15. Pun intended.

## CONCLUSIONS OF LAW

1. The board has jurisdiction of the parties and subject matter of this appeal.

2. An appeal is timely if it is filed with the Environmental Hearing Board within 30 days from the date of receipt of written notice, or the date of receipt of actual notice, of an action of DER.

3. The Pennsylvania Water Obstructions Act of June 25, 1913, P.L. 555, 32 P.S. §§681, et seq., must be read in conjunction with article I, sec. 27, of the Pennsylvania Constitution.

4. The Water Obstructions Act, 32 P.S. §§681, et seq., in conjunction with article I, sec. 27, of the Pennsylvania Constitution, prohibits the construction of the water obstructions which are the subject of this appeal unless permits therefor have been granted by DER prior to the construction.

5. The Executive Order of the Governor, dated July 13, 1973, in conjunction with article I, sec. 27, of the Pennsylvania Constitution, requires PennDOT to obtain a new or amended water obstructions permit from DER before constructing the water obstructions which are the subject of this appeal.

6. Appellant has established by a preponderance of the evidence that PennDOT's application for water obstruction permits was not accompanied by complete maps, plans, profiles and specifications of the water obstruction which PennDOT now plans to construct.

7. As provided in the Erosion Control Rules and Regulations, particularly 25 Pa. Code §102.41(a), PennDOT need not obtain an erosion and sedimentation control permit prior to the commencement of any earth-moving activity in connection with the North Penn Expressway because the plan was de-

veloped with and approved by the Soil Conservation Service.

8. When a Commonwealth action affecting the environment is under review, article I, sec. 27, of the Pennsylvania Constitution requires that the reviewing court or board test the decision by a threefold standard: (1) Was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources? (2) does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum? (3) does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion? PennDOT has not fully met the first test.

## ORDER

And now, August 29, 1975, this matter of Precision Tube Co., Inc. v. Commonwealth of Pennsylvania, Department of Environmental Resources, PennDOT, intervenor, is hereby remanded to DER for further action consistent with this opinion.